Paul W. SCHAFF, Petitioner–
Appellant,

v.

Donald SNYDER,* Respondent–
Appellee.

No. 97–3759.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1998.

Decided Aug. 20, 1999.

---

* Pursuant to Federal Rule of Appellate Procedure 43(c), Donald Snyder, present Director of the Illinois Department of Corrections, has been substituted for Odie Washington as Respondent in this case. The Department of Corrections retains custody of Mr. Schaff during the period of mandatory supervised release he presently is serving. *See* 730 ILCS 5/3–14–2.

Sidney I. Schenkier, Suzanne J. Prysak (argued), Jenner & Block, Chicago, IL, for petitioner-appellant.

Lorna Trinidad DeLeon Amado, Jay Hoffmann (argued), Office of the Attorney General, Chicago, IL, for respondent-appellee.

Before POSNER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Paul W. Schaff was tried by a jury and found guilty of the criminal and aggravated criminal sexual assault of a 7-year old boy. *See* 720 ILCS 5/12–13(a)(2); 5/12–14(b)(1). On September 14, 1990, he was sentenced to ten years of imprisonment. After serving five years, he was placed on mandatory supervised release; in addition, until March 2005, he is subject to the requirements of the Sex Offender Registration Act, 730 ILCS 15¾, and the Child Sex Offender and Murderer Community Notification Law, 730 ILCS 152/125.

Mr. Schaff filed a petition for writ of habeas corpus in the district court on April 1, 1997. *See* 28 U.S.C. § 2254. The court denied Mr. Schaff's petition but granted a certificate of appealability with respect to one claim in his petition. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. Trial Evidence

The State of Illinois initiated its case against Mr. Schaff after 7 year-old K.A. told therapists at the Children's Advocacy Center that he had been assaulted sexually by Mr. Schaff. The events that form the basis of this case occurred in July and August 1989. Mr. Schaff and his wife had bought an apartment building in January of that year; they lived in it and leased the remaining apartments. In the apartment

building next door to the Schaffs', K.A. lived with his father, mother and older brother. The central courtyard between the buildings of the apartment complex was a play area for the children living in the apartments. According to K.A.'s testimony, sometime after the Fourth of July, 1989, while K.A. was riding his bike in that courtyard, Mr. Schaff approached him and told him to come to one of his apartments. When they were in the apartment, K.A. testified, Mr. Schaff told him to go into the bedroom and to take off his clothes. According to K.A., Mr. Schaff said he would kill him if K.A. failed to comply. K.A. then described two sexual acts performed on him by Mr. Schaff. Afterwards, K.A. testified, Mr. Schaff warned K.A. that he would kill K.A.'s parents if he told them. K.A. reported his subsequent loss of appetite, stomach aches, nightmares and fear of telling his parents about the incident. He testified that he eventually revealed the occurrence to treatment specialist Larry Disch and psychotherapist Pamela Klein at the Children's Advocacy Center.

The next State's witness was K.A.'s mother. As the Illinois appellate court's opinion on postconviction review stated:

> The victim's mother testified at trial that she watched a "broadcast on television about symptoms for sexual abuse" on July 31, 1989. She then called the Hanover Park Police Department because she believed her son exhibited some of the symptoms described in the program. The police referred her to the children's advocacy center. She testified that she called the center on August 1, 1989, and brought her son to the center the same day.

*People v. Schaff*, 281 Ill.App.3d 290, 217 Ill.Dec. 119, 666 N.E.2d 788, 790 (1996) ("*Schaff II*"). His mother testified that K.A. spent 1+ hours at the Center on August 1, 1989, and attended weekly counseling sessions thereafter with treatment specialist Larry Disch. On September 7, 1989, she took K.A. to the Center on an

emergency basis after he had refused to eat for three or four days and had been suffering from stomach aches, nightmares and bed wetting. Pamela Klein, the Director of the Center, saw K.A. on that date because Larry Disch was not at the Center. She testified "that the victim told her in a private session that he had been sexually abused by the defendant." *Id.*

Other witnesses presented by the State included K.A.'s father, who testified about his son's behavioral problems, and Larry Disch, who testified about K.A.'s statements to him, including the boy's statement on September 12, 1989, detailing the defendant's sexual assault on him. State's witness Dr. Sharon Ahart, an expert in pediatric ecology, was the physician who physically examined K.A. She testified that she found evidence of mildly lax rectal tone, an abnormality consistent with penile penetration of an adult to a child. Officer Daniel Driscoll testified that, on September 13, 1989, K.A. told him of the defendant's sexual assault on him. The State's final witness was Dr. Jon Conte, a qualified "expert in the field of child sexual assault from a therapeutic viewpoint." Tr. at 534. He opined, from examining K.A.'s records and conversing with Larry Disch, that K.A. could be diagnosed as suffering from post-traumatic stress disorder precipitated by sexual abuse.

The defense presented one witness, Dr. Jack Arbit, an expert in clinical psychology. In his opinion, the Children's Advocacy Center followed none of the professionally accepted procedures when evaluating K.A. Moreover, Dr. Arbit testified, K.A.'s statements of September 7, 1989, were not "reliable within a reasonable degree of scientific psychological certainty." Tr. at 702. He testified, based on the records of the Children's Advocacy Center, of Mount Sinai Hospital (where Dr. Ahart gave K.A. a physical examination), and of the police, that he was unable to diagnose K.A. as suffering from post-traumatic stress disorder because there was insufficient basic data from which to make the diagnosis.

## B. Jury Deliberations

The jury deliberated for two days, June 25 and 26, 1990. It made three requests of the court, all of which were denied.[1] After lunch on the second day, the foreperson stated that he did not believe it was reasonably probable that a verdict could be reached. The trial court asked him to report the number of ballots taken thus far and the numerical breakdown of the last ballot without indicating which side was favored. The court was told there had been six ballots and the count was 7 to 5. The trial court then gave the jury a supplemental instruction and told it to continue its deliberations.

The defense made five motions for mistrial on that second day, all of which were denied. At 3:45 p.m., the jury foreperson stated that the jury was still unable to reach a verdict but that he would like another half-hour or so. The trial court again asked for the last count without indicating which side was favored; the foreperson stated that the count was 11 to 1. When the requested half-hour was over, the defense raised its fifth motion for mistrial. Although the court denied it, the court told defense counsel that it would declare a mistrial if the jury did not reach a verdict by 4:30. At 4:22, the jury requested new verdict forms; the court tendered the forms at 4:30, and the jury returned its verdict of guilty ten minutes later.

## C. Post–Trial Evidence

On September 12, 1994, four years after Mr. Schaff had been sentenced, a thirteen year-old friend of K.A. filed an affidavit reporting a conversation he had had with

---

1. The jury asked for transcripts, for a legal definition of "reasonable doubt," and for options other than "guilty or not guilty." After each request, the court responded by telling the jury to continue with its deliberations. *See People v. Schaff*, 248 Ill.App.3d 547, 187 Ill.Dec. 975, 618 N.E.2d 566, 567 (1993) ("*Schaff I*").

K.A. He stated that K.A. had told him that Mr. Schaff never had touched him. According to the affidavit, some of K.A.'s friends also had said that K.A. lied at trial because his mother had wanted to get Mr. Schaff in trouble. The affiant stated that he told two neighbors and then told Mrs. Schaff, by telephone, what K.A. had said. In her affidavit, dated September 15, 1994, Mrs. Schaff stated that she believed she gave that information to her husband's trial defense counsel shortly after she received it. Mr. Schaff asserts that his trial counsel neither investigated that information nor raised K.A.'s recantation in his post-trial motion.

### D. Appellate Review

Mr. Schaff, with new counsel, appealed the state court conviction. The state appellate court affirmed the conviction on direct appeal.[2] *See People v. Schaff*, 248 Ill.App.3d 547, 187 Ill.Dec. 975, 618 N.E.2d 566, 567 (1993) (*"Schaff I"*). The Illinois Supreme Court denied Mr. Schaff's petition for leave to appeal. *See People v. Schaff*, 152 Ill.2d 575, 190 Ill.Dec. 906, 622 N.E.2d 1223 (1993), *cert. denied*, 510 U.S. 1201, 114 S.Ct. 1317, 127 L.Ed.2d 667 (1994). The Cook County Circuit Court then denied his petition for post-conviction relief, and the Illinois Appellate Court affirmed.[3] *See People v. Schaff*, 281 Ill. App.3d 290, 217 Ill.Dec. 119, 666 N.E.2d 788, 792 (1996) (*"Schaff II"*). The Illinois Supreme Court also denied the petition.[4] *See People v. Schaff*, 168 Ill.2d 617, 219 Ill.Dec. 573, 671 N.E.2d 740 (1996).

On April 1, 1997, Mr. Schaff filed a petition for writ of habeas corpus in the district court. He raised the same seven grounds he had raised in his post-conviction petition. The district court denied habeas relief but issued a certificate of appealability ("COA") with respect to one of the seven claims. Mr. Schaff appeals that claim and seeks a COA with respect to the six other issues for which a COA was not granted.

## II

## DISCUSSION

### A.

Mr. Schaff contends that he was convicted of a crime that he did not commit because the jury never heard critical information contradicting the State's case. Central to his claims is evidence that was not presented at trial, evidence of a plan

2. On direct appeal, Mr. Schaff raised two issues: (1) The trial court's supplemental jury instruction was coercive, and the court's inquiry into the numerical breakdown of the jury's votes during deliberations prejudiced him; and (2) the jury's awareness of extraneous prejudicial information denied him a fair trial.

3. In his petition for post-conviction relief, Mr. Schaff raised seven issues: (1) The State used the victim's perjured testimony to obtain a conviction; (2) the State's use of the inherently unreliable testimony of Pamela Klein deprived Mr. Schaff of his right to a fair trial; (3) the unreliable expert testimony of Dr. Conte deprived Mr. Schaff of a fair trial; (4) trial counsel was ineffective in (a) failing to investigate the retaliatory motive of two tenants, Kathy Ulber and Linda Gutierrez; (b) failing to investigate Pamela Klein's suspect background; and (c) failing to raise newly discovered evidence of K.A.'s confession to his friend; (5) the State failed to disclose exculpatory evidence regarding the circumstances of Pamela Klein's leaving the Center; (6) Mr. Schaff was deprived of a fair trial because the jurors learned of other charges pending against him; and (7) the trial court improperly coerced the jury into reaching a verdict.

4. Mr. Schaff raised only 3 issues in the Illinois Supreme Court: (1) The state appellate court did not apply the proper standard of review in affirming the circuit court's summary dismissal of his post-conviction motion; (2) the state appellate court's opinion was in direct conflict with the Illinois Supreme Court's holding in *People v. Whitehead*, 169 Ill.2d 355, 215 Ill.Dec. 164, 662 N.E.2d 1304, *cert. denied*, 519 U.S. 1030, 117 S.Ct. 587, 136 L.Ed.2d 517 (1996); and (3) the Illinois Appellate Court erred in holding that the doctrine of res judicata barred Mr. Schaff from asserting that the jury's verdict was tainted and coerced.

by one of Mr. Schaff's disgruntled tenants to "set up" Mr. Schaff by accusing him of child abuse. In his appellate brief, Mr. Schaff recites the information that he believes should have been presented to the jury. He states that Kathy Ulber, who lived in Mr. Schaff's building with her daughters and boyfriend, was angry because Mr. Schaff evicted her at the end of her lease. She told her neighbor Jennie Ramirez that she was going to get her revenge by accusing Mr. Schaff of being a child molester. On July 25, 1989, the day Ulber vacated her apartment, her friend Linda Gutierrez told her she saw Mr. Schaff in a vacant apartment with 3 year-old L.H. (who was naked with her bathing suit off) and 4 year-old A.H. (who was clothed and leaving the bathroom). After hearing this information, Ulber telephoned the police and accused Mr. Schaff of sexual abuse of the children. When the police came, Gutierrez told them she suspected that someone had molested her daughter as well. Mr. Schaff told the police that the children had used the bathroom and that he was helping Lisa put on her bathing suit. The children's mother said she thought that Gutierrez was simply getting back at Mr. Schaff for evicting several of her friends. The police took no action at that time. Nevertheless, that evening, Gutierrez and Ulber contacted the Hanover Park Children's Advocacy Center and claimed that Mr. Schaff had sexually abused their daughters, S.G. and T.U., and the two children seen with Mr. Schaff earlier that day, L.H. and A.H.

On July 27, 1989, the mothers went to the Center with their children and were interviewed by Pamela Klein, Director of the Center, and a police officer and an assistant state's attorney. The next day, Mr. Schaff was arrested on charges of sexually assaulting those four children.

Mr. Schaff submits that Ulber and Gutierrez knew the allegations of sexual abuse were false and that other tenants knew the charges against Mr. Schaff were made in retaliation for Ulber's eviction.

Mr. Schaff also charges that Ulber urged K.A.'s mother to contact the Center about her son's problems—his nightmares, bed wetting and refusal to eat—and that the Center's intake records indicate that Ulber referred K.A.'s mother to the Center. Mr. Schaff claims that K.A.'s mother lied when she testified that she had contacted the Center after watching a television show about sexual abuse.

After K.A.'s report of sexual abuse to Ms. Klein on September 7, 1989, Mr. Schaff was charged with the sexual assault of K.A.

**B.**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to this case because Mr. Schaff filed his federal habeas petition after the effective date of AEDPA, April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The Act amended 28 U.S.C. § 2254(d); that provision now states that habeas relief shall not be granted unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). Mr. Schaff does not dispute the state courts' determinations of the facts.[5] For that reason, we discuss only § 2254(d)(1). *See Yancey v. Gilmore*, 113 F.3d 104, 106 (7th Cir.1997).

5. Mr. Schaff's focus, instead, is primarily on evidence that was not presented at trial, such as K.A.'s recantation, Pamela Klein's background and firing, and the tenants' scheme to retaliate against Mr. Schaff. In any case, the facts of the state court decisions are "presumed to be correct." 28 U.S.C. § 2254(e)(1). A petitioner like Mr. Schaff has the burden of rebutting that presumption of correctness by clear and convincing evidence. *See id.; Williams v. Parke*, 133 F.3d 971, 973 (7th Cir.1997).

■■ To secure a writ under (d)(1), a petitioner first must show "that the Supreme Court has 'clearly established' the propositions essential to [his] position." *Mueller v. Sullivan*, 141 F.3d 1232, 1234 (7th Cir.1998). "Only 'clearly established' rules could be applied on collateral attack; and a rule was not 'clearly established' unless it was 'compelled by existing precedent.'" *Hogan v. Hanks*, 97 F.3d 189, 192 (7th Cir.1996) (quoting *Saffle v. Parks*, 494 U.S. 484, 488, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990)), *cert. denied*, 520 U.S. 1171 (1997); *see also Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir.1998) (concluding that Supreme Court case law is clearly established "if Supreme Court precedent would have compelled a particular result in the case"), *cert. denied*, —— U.S. ——, 119 S.Ct. 811, 142 L.Ed.2d 671 (1999). We may no longer rely upon our own precedent or that of other circuit courts of appeals to grant a writ. *See Yancey*, 113 F.3d at 106. A petitioner must have a Supreme Court case to support his claim, and that Supreme Court decision must have clearly established the relevant principle as of the time of his direct appeal. *See id.* at 106–07.

■■ The petitioner next must show that the state court's decision was either "contrary to" clearly established Supreme Court case law or, alternatively, was an "unreasonable application" of Supreme Court case law. *See Bocian v. Godinez*, 101 F.3d 465, 471 (7th Cir.1996) (citing *Lindh v. Murphy*, 96 F.3d 856, 869–70 (7th Cir.1996) (en banc), *reversed on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)). Whether the state ruling was "contrary to" Supreme Court case law is a legal determination that we review de novo.[6] In *Lindh*, we explained:

> Section 2254(d) requires us to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law "as determined by the Supreme Court of the United States" that prevails.

*Id.* at 869.

■■ Whether the state court's holding involved an "unreasonable application" of clearly established federal law, as determined by the Supreme Court, is a mixed question of law and fact that we traditionally also review de novo but with a grant of deference to any *reasonable* state court decision.[7] *See Hall v. Washington*, 106

**6.** *See Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 887 (3d Cir.1999), *petition for cert. filed*, 68 U.S.L.W. 3008 (U.S. Jun. 22, 1999) (No. 98–2050).

**7.** In *Hall v. Washington*, 106 F.3d 742, 748 (7th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 264, 139 L.Ed.2d 190 (1997), we considered the standard for reviewing whether a state court applied federal law "unreasonably." We first stated the long-settled general rule that, in the context of habeas review, mixed questions of law and fact are given plenary review. *See Thompson v. Keohane*, 516 U.S. 99, 111–13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (noting that mixed questions of law and fact are treated as legal questions for purposes of habeas review); *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (ruling that voluntariness of a confession is a mixed question entitled to independent federal review). In *Hall*, we continued by explaining the careful deferential balance a federal court must strike when reviewing "the more subtle question of

whether the state court 'unreasonably' applied clearly established federal law as the Supreme Court has determined it." *Hall*, 106 F.3d at 748.

> The statutory "unreasonableness" standard allows the state court's conclusion to stand if it is one of several equally plausible outcomes. On the other hand, Congress would not have used the word "unreasonable" if it really meant that federal courts were to defer in all cases to the state court's decision. Some decisions will be at such tension with governing U.S. *Supreme Court* precedents, or so inadequately supported by the record, or so arbitrary, that a writ must issue.

*Id.* at 748–49. Earlier, in *Lindh v. Murphy*, our court en banc had stated that, "when the dispute lies not in the meaning of the Constitution, but in its application to a particular set of facts—when it is, in the standard phrase, a 'mixed question of law and fact'— § 2254(d)(1) restricts the grant of collateral relief to cases in which the state's decision reflects 'an unreasonable application of' the

F.3d 742, 748 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 264, 139 L.Ed.2d 190 (1997). When determining whether the state court unreasonably applied clearly established Supreme Court precedent, we recognize that "the statute commands deference to the state court's judgment by using the word 'unreasonable,' which is stronger than 'erroneous' and maybe stronger than 'clearly erroneous.'" *Hennon v. Cooper,* 109 F.3d 330, 334 (7th Cir.) (citation omitted), *cert. denied,* —— U.S. ——, 118 S.Ct. 72, 139 L.Ed.2d 32 (1997). If the determination was reasonable, that is, "at least minimally consistent with the facts and circumstances of the case," we shall uphold the state court ruling, even if it is not well reasoned or fully reasoned, *id.* at 335, or even "if it is one of several equally plausible outcomes," *Hall,* 106 F.3d at 748. On the other hand, if the determination is "at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary," then the writ must issue. *Hall,* 106 F.3d at 749.

### C.

We shall consider first Mr. Schaff's claim that was certified by the district court. The district court granted a COA on the following ground:

> Schaff makes a substantial showing of the denial of a constitutional right with respect to his allegation that prosecutors failed to disclose Pamela Klein had been fired (or was asked to resign) by the children's advocacy center, in violation of *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).... [I]t is a close question whether there is a

law," 96 F.3d at 870, and that determination must be made on a case-by-case basis.

**8.** Mr. Schaff also claims that Klein misrepresented her credentials by falsely claiming she was a psychologist and by falsely claiming she worked on specific projects; that Klein had diagnosed a case of "ritual satanic abuse"

reasonable probability that the result of Schaff's trial would have been different had prosecutors disclosed the circumstances under which Klein left the children's advocacy center.

R.25.

■ It is a violation of due process for the state to suppress evidence favorable to the accused when that evidence "is material either to guilt or to punishment," *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or to suppress evidence that goes to the credibility of crucial prosecution witnesses, *see Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Mr. Schaff asserts that the prosecution violated his due process rights under *Brady* when it failed to disclose that, two months after meeting with K.A., Pamela Klein was fired from the Center for misconduct.[8] Mr. Schaff did not challenge the Government's nondisclosure of this information on direct appeal, and on post-conviction review the state appellate court held the claim had been waived. *See Schaff II,* 217 Ill.Dec. 119, 666 N.E.2d at 790–91. When Mr. Schaff raised the claim in his habeas petition, the district court held that Mr. Schaff was not entitled to habeas relief on the merits of his claim because he had failed to show that the procedural default doctrine should not apply. *See* R.20 at 12. Mr. Schaff challenges this ruling on appeal.

#### 1. Procedural Default

■ In a post-AEDPA case, *Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (per curiam), the Supreme Court announced that the traditional procedural default doctrine was still the rule of law: "It is the rule in this country

over the telephone; and that one state court had ruled she was not a legitimate therapist and that some agencies questioned her practices. Mr. Schaff contends, as well, that when Dr. Conte, who had used Klein's records to diagnose K.A.'s symptoms, learned of her unreliability, he developed "serious doubts" as to Mr. Schaff's guilt.

that assertions of error in criminal proceedings must first be raised in state court in order to form the basis for relief in habeas." *Id.* at 1355 (citing *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)). One who fails to assert in state court his claim that his rights were violated "cannot raise a claim of violation of those rights now on federal habeas review." *Id.*; *see O'Sullivan v. Boerckel,* —— U.S. ——, —— – ——, 119 S.Ct. 1728, 1732–34, 144 L.Ed.2d 1 (1999); *cf. Calderon v. Thompson,* 523 U.S. 538, 118 S.Ct. 1489, 1502, 140 L.Ed.2d 728 (1998) (stating that general principles underlying our habeas corpus jurisprudence, such as the imposition of significant limits on the discretion of federal courts to grant habeas relief or to recall its mandate, "comport[ ] with the values and purposes underlying AEDPA"). Therefore, we first must determine whether the state courts had a full and fair opportunity to review the claim:

> Providing a full and fair opportunity requires that [the petitioner] have exhausted his state remedies, see 28 U.S.C. § 2254(b), (c), and have avoided procedurally defaulting his claims during the state court proceedings. If [the petitioner] failed to meet either of these requirements, we are barred from reaching the merits of his claims on federal habeas review.

*Moore v. Parke,* 148 F.3d 705, 708 (7th Cir.1998) (citations omitted).

 A federal court presented with a habeas corpus action is barred from reviewing a question of federal law "when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman v. Thompson,* 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see also Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (holding that a federal habeas court is not at liberty to question a state court's application of a state procedural rule when the state court's determination of procedural default is based upon an adequate and independent state ground). In this case, the state appellate court on post-conviction review concluded that the claim was procedurally waived under *People v. Erickson,* 161 Ill.2d 82, 204 Ill.Dec. 231, 641 N.E.2d 455 (1994), *cert. denied,* 514 U.S. 1107, 115 S.Ct. 1956, 131 L.Ed.2d 849 (1995). In that case, the Supreme Court of Illinois held that "[f]ailure to raise a claim which could have been addressed on direct appeal is a procedural default which results in a bar to consideration of the claim's merits in a post-conviction proceeding." *Schaff II,* 217 Ill.Dec. 119, 666 N.E.2d at 791 (quoting *Erickson,* 204 Ill.Dec. 231, 641 N.E.2d at 458).

Mr. Schaff responds that he could not have procedurally defaulted on this claim because the information concerning Ms. Klein's background was not in the trial record and thus could not have been reviewed on direct appeal. According to Mr. Schaff, the Supreme Court of Illinois will not find waiver in such a situation. *See People v. Whitehead,* 169 Ill.2d 355, 215 Ill.Dec. 164, 662 N.E.2d 1304, 1311 (appellant cannot waive an issue based on evidence not in the trial record), *cert. denied,* 519 U.S. 1030, 117 S.Ct. 587, 136 L.Ed.2d 517 (1996). Mr. Schaff describes *Erickson* as "an aberrational case that the *Whitehead* court limited to its unique facts and that is not representative of the general rule in Illinois concerning waiver of issues on appeal." Appellant's Reply Br. at 8. Thus, Mr. Schaff submits, there was no waiver in this case.

We cannot accept Mr. Schaff's characterization of the relationship of those two cases. *Erickson* is not aberrational or limited by *Whitehead.* In *Erickson,* a witness proffered by the defense in a capital sentencing hearing was cross-examined about his professional credentials and revealed that he lacked the expertise that he had claimed. The court therefore permitted the witness to testify only as a lay person, not as an expert. On appeal, the defendant argued that the testimony had de-

prived him of a fair hearing. The Supreme Court of Illinois determined that the witness' testimony had been at issue before the trial court and that, therefore, the defendant had the opportunity to challenge it on direct appeal. His failure to raise the claim then, on direct appeal, constituted a procedural default, the court concluded, and barred consideration of the issue on post-conviction review.

> The bar normally reaches to all matters that could have been—not merely were not—earlier raised. Thus, the mere fact that support for a claim is contained in papers not in the trial record is largely immaterial. Reason to relax the bar occurs only when what is offered in the papers also explains why the claim it supports could not have been raised on direct appeal.

> For example, the default may not preclude an ineffective-assistance claim for what trial counsel allegedly ought to have done in presenting a defense.

641 N.E.2d at 458.

In *Whitehead*, the Supreme Court of Illinois expressly reaffirmed *Erickson* and enumerated a more comprehensive catalogue of exceptions to the waiver rule: (1) where fundamental fairness so requires; (2) where the alleged waiver stems from incompetency of appointed counsel on appeal; and (3) where the facts relating to the claim do not appear on the face of the original appellate record. *See* 215 Ill.Dec. 164, 662 N.E.2d at 1312. In further explicating the third exception, the court said:

> With respect to the third exception, as a matter of clarification, it is not so much that such a claim "could not have been presented" or "raised" by a party on direct appeal, but rather that such a claim could not have been considered by the reviewing court because the claim's evidentiary basis was de hors the record. Thus, the exception recognizes that waiver ought not to preclude that species of claim which, though theoretically capable of being "presented" on appeal, is nonetheless incapable of consideration by a reviewing court because of rules governing the scope of appellate review.

662 N.E.2d at 1312 (citations omitted). This statement must, however, be read in the context of the case. In *Whitehead*, the court was dealing with the sort of ineffective assistance of counsel claim that, it had noted earlier in *Erickson*, survived the bar of waiver. Analyzing the particular ineffective assistance of counsel claim before it, the Supreme Court of Illinois made the following distinction in *Whitehead*: The claim of trial counsel's ineffectiveness in handling the defenses of insanity, intoxication and reasonable doubt at trial did not depend on the experts' post-conviction affidavits but rather on facts apparent in the record at trial; thus these claims were available for consideration on direct appeal. *See id.* at 1313–14. By contrast, the claim of ineffectiveness at sentencing depended on the affidavits of doctors who concluded that the defendant suffered from a brain disease. *See id.* at 1315. This claim therefore was not waived. With respect to the latter claim, the court held, the factual information presented in documents at the postconviction stage was not a part of the trial record; therefore the claim could not have been presented for consideration on direct appeal. *See id.*

 We believe that the Appellate Court of Illinois applied the waiver jurisprudence of its Supreme Court in a principled manner. We must therefore respect its conclusion that, under Illinois law, a procedural default occurs when, as occurred in Mr. Schaff's case, a witness' challenged testimony was before the court at trial and the opportunity to challenge it was available on direct appeal but still was not pursued. Mr. Schaff therefore cannot claim the procedural default exception carved out in *Whitehead*; the trial record was far from devoid of evidence concerning Klein's loss of her job at the Center. As the state appellate court noted, the State had tendered to defense counsel a copy of

Klein's curriculum vitae.[9] When counsel cross-examined Klein about her experience and qualifications, Klein "admitted she did not have a license to practice psychotherapy and no longer worked at the children's abuse center"; however, "counsel chose not to inquire further." *Schaff II*, 217 Ill.Dec. 119, 666 N.E.2d at 791. Under these circumstances, the Appellate Court of Illinois reasonably concluded that the necessary information was available during the trial and that Mr. Schaff's post-conviction petition did "not explain why these allegations about Klein could not have been raised on direct appeal." *Id.*

The state appellate court properly applied the Illinois law of waiver and correctly concluded that, because the claim could have been raised and addressed on direct appeal, but was not, it was waived. *See Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). The waiver bars Mr. Schaff's claim absent a showing of cause and prejudice [10] or a fundamental miscarriage of justice.[11]

## 2. Cause and Prejudice

Mr. Schaff submits that, even if he had procedurally defaulted, he is entitled to a review on the merits because he has demonstrated both cause and prejudice for his failure to raise the issue on direct appeal. The petitioner asserts that his constitutionally ineffective trial counsel failed to discover the fact that Klein had been fired, and his constitutionally ineffective appellate counsel failed to raise on direct appeal the claim that his trial counsel was ineffective. He further claims that the failure to discover Klein's termination from the Center was prejudicial because that information would have discredited Klein and would have affected the credibil-

ity of Dr. Conte and K.A. as well. Finally, Mr. Schaff asserts that it would be a fundamental miscarriage of justice not to reach the merits of his claim against Klein, for the State's case would have crumbled had Klein's credentials, and with them her corroboration of K.A.'s testimony, been placed in doubt. According to Mr. Schaff, no reasonable juror would have convicted him after hearing the new evidence.

We must conclude that Mr. Schaff has not established cause or prejudice. Mr. Schaff submits that the reason or "cause" for his failure to raise the claim is that his appellate counsel was ineffective. We cannot accept the contention that the performance of trial defense counsel or of appellate defense counsel was so deficient as to constitute constitutionally ineffective assistance of counsel.

An assessment of the performance of either appellate or trial counsel is based on the well-established standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052. This standard is met only when it is established that counsel's performance was so deficient that it can be said that counsel was not functioning as the counsel guaranteed to the criminal defendant by the Sixth Amendment. Furthermore, it must be established that such deficient performance prejudiced the defendant by depriving him of a fair trial, one whose result is reliable. *See Mason v. Hanks*, 97 F.3d 887, 892–93 (7th Cir.1996) (concluding that one demonstration of inef-

---

9. Even though Klein's resume was tendered on the day she testified, defense counsel neither objected to its late delivery nor sought a continuance to review the material. Thus, any challenge to the timeliness of the prosecution's disclosure of Klein's resume is now waived. It is noteworthy as well that Klein did not testify as an expert or as a therapist.

10. *See Wainwright v. Sykes*, 433 U.S. 72, 87–88, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

11. *See Schlup v. Delo*, 513 U.S. 298, 324–26, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

fective assistance of appellate counsel is a showing that appellate counsel did not present significant and obvious issues on appeal).

■■ The constitutional ineffectiveness of trial defense counsel could be established only by showing that trial counsel's failure to pursue the *Brady* violation was professionally deficient and that this substandard performance was prejudicial to Mr. Schaff. Mr. Schaff would have established a *Brady* violation only by showing that the prosecutor withheld exculpatory evidence (the firing of Klein) and that the evidence was material. It is true that Klein's resume, delivered to the defense in an untimely manner but without objection, indicated that her employment with the Center had terminated in December 1989. Indeed, she testified that she no longer worked for the Center. Although defense counsel had the opportunity to discredit her on cross-examination, to discover the reason for her termination from the Center, and to further develop her suspicious professional background, counsel did not pursue this inquiry. Yet, even at this stage of the litigation, Mr. Schaff has failed to demonstrate that the State knew the circumstances of Klein's termination of employment and then withheld that information.[12] In addition, he has failed to show that the undisclosed evidence was material.[13] The reason that Klein was fired—for accepting private clients for a fee—is not evidence that is at all material to the evidence proffered in her testimony concerning K.A.'s statements to her. Even though her termination indicated poor ethical judgment on Klein's part, Mr. Schaff has not shown and

could not show that the Government's failure to produce the information deprived him of a fair trial. We conclude that there is no reasonable probability that disclosure of that information would have led to a different result at trial. *See Kyles v. Whitley*, 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Nobles v. Johnson*, 127 F.3d 409, 416–17 (5th Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998).

Because the underlying claim that trial defense counsel was constitutionally ineffective was at best a weak one, we cannot say that appellate defense counsel was constitutionally ineffective in failing to raise it on direct appeal. As the district court wrote:

Schaff fails to show that it was "outside the wide range of professionally competent assistance" for his appellate counsel not to raise the ineffective assistance claim. *See Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. Indeed, many argue the art of appellate advocacy is in narrowing one's arguments and in focusing on the strongest claims. In his affidavit, Schaff asserts his appellate counsel never talked with him about the issues raised on appeal; he does not assert that his appellate counsel failed to consider raising the ineffective assistance claim. Schaff's appellate counsel cannot be deemed constitutionally ineffective based on Schaff's mere assertion that this is so.

R.20 at 15.

The state appellate court properly determined that the *Brady* claim had been waived.

**12.** As the Supreme Court stated in *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), "showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more." The Court emphasized that the prosecution has a responsibility to disclose "known, favorable evidence rising to a *material* level of importance." *Id.* at 438, 115 S.Ct. 1555 (emphasis added); *see also Crivens v. Roth*, 172 F.3d 991, 996–99 (7th Cir.1999) (concluding

that the prosecution withheld known and material evidence from the defense).

**13.** *See Strickler v. Greene*, —— U.S. ——, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) ("Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' ")(quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

### D.

Mr. Schaff raises in this court a number of issues with respect to which the district court did not grant a certificate of appealability ("COA").

■■■■■] Under 28 U.S.C. § 2253(c)(2), a COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." [14] In this case, the district court issued a COA with respect to only one of Mr. Schaff's claims: the State's failure to disclose that Pamela Klein had been fired by the Children's Advocacy Center. However, the lack of a COA is not fatal. The governing statute and our case law clearly establish that this court has the authority to issue a COA as long as the applicant meets the statutory criterion for its issuance by making "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Therefore, we may reach the merits of a claim only if Mr. Schaff makes such a showing. *See Porter v. Gramley*, 112 F.3d 1308, 1312 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 886, 139 L.Ed.2d 873 (1998).[15] Here, Mr. Schaff asks that we grant a COA with respect to the issues on which the district court failed to grant a certificate. We decline to do so and, in the following subsections, shall set forth brief-

ly our reasons for believing that a certificate ought not to be granted.[16]

#### 1.

Mr. Schaff submits that Pamela Klein's testimony at trial was inherently unreliable and incredible. According to Mr. Schaff's allegations, Klein was not a licensed psychologist and had a history of dubious practices, involving the diagnosing of satanic abuse and coaching of victims of sexual abuse. He again notes that she had been fired from her position at the Children's Advocacy Center. Mr. Schaff argues the domino effect of her unreliability as a witness: Her reporting of K.A.'s account of abuse becomes suspect and Dr. Conte's testimony evaluating K.A.'s statements likewise becomes questionable.

Although the submission of Mr. Schaff presents a serious factual allegation, he has made no showing whatsoever of a denial of a federal constitutional right. Moreover, in *Schaff II*, 281 Ill.App.3d 290, 217 Ill.Dec. 119, 666 N.E.2d 788, 790–91 (1996), the Illinois appellate court held that this claim—that Klein's background, practices and procedures were inherently suspect—was waived under the rule articulated in *Erickson*, 161 Ill.2d 82, 204 Ill.Dec. 231, 641 N.E.2d 455 (1994), *cert. denied*, 514 U.S. 1107, 115 S.Ct. 1956, 131 L.Ed.2d

---

14. As amended by the AEDPA, 28 U.S.C. § 2253(c) states:

(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
(B) the final order in a proceeding under section 2255.
(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

15. *See also Heidelberg v. Illinois Prisoner Review Bd.*, 163 F.3d 1025, 1025–26 (7th Cir.

1998) (per curiam) (denying COA sought by § 2254 petitioners because "substantial showing" was not made); *Buggs v. United States*, 153 F.3d 439, 443 (7th Cir.1998) (construing the inclusion of an issue not certified by the district court as an implicit request for a COA; denying COA for § 2255 petitioner because no substantial showing was made); *Williams v. United States*, 150 F.3d 639, 641 (7th Cir.1998) (analyzing § 2253, concluding that a circuit judge may issue a COA); *Williams v. Parke*, 133 F.3d 971, 975 (7th Cir.1997) (stating that a circuit court is not constrained by the issues certified by the district court).

16. We note that, until the court of appeals augments the COA, the appellee may ignore the extra issues in the appellant's brief. *See Sylvester v. Hanks*, 140 F.3d 713, 715 (7th Cir.1998).

849 (1995). The district court agreed that the claim was waived. It also concluded that Mr. Schaff failed to establish that his appellate counsel was ineffective by demonstrating that it was "outside the wide range of professionally competent assistance" for the appellate counsel not to raise the claim of trial counsel's ineffective assistance. R.20 at 15. The district court further determined that, if it were to reach the merits, trial counsel was not ineffective. It held that the state court was not unreasonable in concluding that trial counsel provided effective assistance.

 We cannot say that the state court's invocation of its waiver rule was unprincipled. Nor can we say that cause and prejudice may be established by ineffective assistance of counsel. We recognize fully the interrelatedness of Mr. Schaff's claims through his underlying assertion that defense counsel was ineffective for not developing the record concerning Klein's lack of credibility. We cannot discount, however, the possibility that counsel preferred a strategy of attacking Klein's methodology, rather than her personal credibility. It would be a sound tactic for the impeachment of Klein's testimony to discredit the Center's procedures—by pointing out there was no complete history of the child, no clinical diagnostic interview, no battery of psychological tests—and thereby to demonstrate the inadequate and improper evaluation of K.A. Indeed, the testimony of the only defense witness, Dr. Arbit, was focused on just such an attack of the Center's methodology and procedures. As the district court pointed out, had defense counsel impeached Klein personally, there was the possibility that the door might have been opened for the Government to bring in other children accusing Mr. Schaff of sexual abuses in order to show her to be a credible witness. It must be remembered that defense counsel successfully convinced the court to prohibit the State from using proof of Mr. Schaff's sexual abuse of other children. As the district court stated, "If Schaff's counsel used the fabrication/conspiracy defense, he would have opened the door to proof of other alleged incidents. Clearly, Schaff's counsel made a judgment call that discussion of the other children would be more harmful than the fabrication/conspiracy defense would be helpful." R.20 at 16–17.

Because Mr. Schaff fails to make a substantial showing of the denial of any constitutional right, we hold that this claim does not warrant a COA.

**2.**

Mr. Schaff asserts that K.A. recanted his trial testimony sometime after he testified by admitting to his friend that Mr. Schaff never abused or touched him and that his mother fabricated his testimony. K.A.'s friend gave a sworn affidavit reporting K.A.'s admissions.[17] According to Mr. Schaff, K.A.'s recantation demonstrates that K.A. perjured himself at trial. The petitioner admits that the prosecutor did not knowingly use that perjured testimony but contends nevertheless that "the State's continued reliance on [K.A.]'s testimony to sustain the conviction even after learning it was recanted is tantamount to knowing use of perjury and, therefore, also warrants habeas relief." Appellant's Reply Br. at 1. Mr. Schaff urges this court to adopt *Sanders v. Sullivan*, 863 F.2d 218 (2d Cir.1988), in which the Second Circuit held that "recantations of material testimony that would most likely affect the verdict rise to the level of due process violation, if a State, alerted to the recantation, leaves the conviction in place." *Id.* at 225.

The Appellate Court of Illinois, on postconviction review, stated that Mr. Schaff did not allege that the State knowingly introduced false testimony of the victim, as Illinois law requires. *See Schaff II*, 217

17. The affidavit was made 4 years after Mr. Schaff's trial and sentence. In the affidavit, K.A. states that the recantation came sometime after K.A. moved from Walnut Street, but there is no clearer time reference.

Ill.Dec. 119, 666 N.E.2d at 789–90 (citing *People v. Brown*, 169 Ill.2d 94, 214 Ill.Dec. 257, 660 N.E.2d 964 (1995)). It also held that the record did not support Mr. Schaff's allegation that the State knew the victim's mother had testified falsely about the date she first contacted the Children's Advocacy Center. It held that Mr. Schaff failed to make the required substantial showing that his constitutional rights were violated. The district court noted that Mr. Schaff had procedurally defaulted the claim concerning the mother's perjured testimony. It also concluded that Mr. Schaff was not entitled to habeas relief because the state court's decision was not an unreasonable application of federal law as determined by the Supreme Court of the United States.

 The Supreme Court has clearly established that a prosecutor's knowing use of perjured testimony violates the Due Process Clause. *See United States v. Agurs*, 427 U.S. 97, 103 & n. 8, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Pyle v. Kansas*, 317 U.S. 213, 215–16, 63 S.Ct. 177, 87 L.Ed. 214 (1942); *Mooney v. Holohan*, 294 U.S. 103, 110, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (per curiam). The Court requires that a conviction obtained by such knowing use of perjured testimony be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103, 96 S.Ct. 2392.

 Mr. Schaff admits that the prosecution did not knowingly use perjured testimony. His request that we follow Second Circuit precedent (a request that we expressly declined in *Reddick v. Haws*, 120 F.3d 714 (7th Cir.1997), and *Shore v. Warden, Stateville Prison*, 942 F.2d 1117 (7th Cir.1991), *cert. denied*, 504 U.S. 922, 112 S.Ct. 1973, 118 L.Ed.2d 573 (1992)), has no persuasive weight under the AEDPA. A habeas petitioner must support his claim with a Supreme Court decision that clearly establishes the proposition essential to his

position. *See Mueller v. Sullivan*, 141 F.3d 1232, 1234 (7th Cir.1998); *Yancey v. Gilmore*, 113 F.3d 104, 106 (7th Cir.1997). The clearly established Supreme Court precedent demands proof that the prosecution made knowing use of perjured testimony. Mr. Schaff has admitted that, in this case, the prosecution did not; as a consequence, he cannot make a substantial showing of the denial of his right to due process, as required by § 2253(c)(2). We therefore do not grant a COA on this claim.

### 3.

Mr. Schaff submits that his trial defense counsel was constitutionally ineffective in a number of respects: His attorney called only one witness, failed to investigate fully Klein's background and practices, failed to discover the retaliatory motives of disgruntled tenants, and failed to present substantial evidence that the charges against Mr. Schaff were fabricated. The Illinois appellate court held that, because Mr. Schaff did not raise the claim on direct appeal and did not offer evidence to explain why the claim was not raised, he waived it.[18] The district court concluded that the Illinois court's finding of waiver must stand because, under the law of the Supreme Court and of this circuit, a federal habeas court must respect a state court's application of its own state's rules of waiver or procedural default.

 We cannot say that the state appellate court was unprincipled in its determination that the claim was waived and therefore procedurally barred under *People v. Erickson*, 161 Ill.2d 82, 204 Ill.Dec. 231, 641 N.E.2d 455 (1994), *cert. denied*, 514 U.S. 1107, 115 S.Ct. 1956, 131 L.Ed.2d 849 (1995), because the facts relating to the issue appeared in the record and had not been raised on direct appeal. See *Schaff II*, 217 Ill.Dec. 119, 666 N.E.2d at 791 (holding that trial counsel's failure to

---

18. Mr. Schaff's claim that his trial counsel was ineffective because he called only one witness is raised for the first time in this court and clearly is waived.

investigate Klein's background and to investigate the tenants' possible conspiracy to frame him were waived under *Erickson*). Mr. Schaff also contends that his counsel was ineffective with respect to K.A.'s recantation. Specifically, he claims that his counsel was ineffective in not raising the issue in a post-trial motion. In reviewing this contention during the post-conviction review proceedings, the state court held that no relief was warranted because Mr. Schaff had not presented sufficient evidence to demonstrate that trial counsel knew of K.A.'s recantation to his friend in time to raise the issue in his posttrial motion. The only evidence that trial counsel was informed of the recantation is the affidavit of Mrs. Schaff, who stated that she "believed" she informed the trial attorney of the recantation. The state appellate court stated that Mrs. Schaff's affidavit was "equivocal and insufficient to show trial counsel knew that the victim made a recantation to [his friend]." *Schaff II*, 666 N.E.2d at 792.

▇▇ Focusing on the performance of appellate counsel, Mr. Schaff claims that he has shown cause and prejudice for the failure to raise the failure of trial counsel to raise the recantation. We do not believe that Mr. Schaff has demonstrated the high level of prejudice required under *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Ashford v. Gilmore*, 167 F.3d 1130, 1134 (7th Cir.1999) (describing the high threshold tests for prejudice under *Strickland* as defined in later Supreme Court cases). Mr. Schaff contends he was prejudiced by the uncorroborated testimony of a 7 year-old which allegedly was bolstered by uninvestigated witnesses. On the other hand, the jury had heard the testimony of the 7 year-old victim, the counselors and police officer and other individuals to whom the victim described Mr. Schaff's sexual abuse of him. It also heard the testimony of the physician who examined K.A. and testified that his physical condition was consistent with the claim of sexual assault.[19] A COA should not issue on the question of ineffective assistance of counsel because Mr. Schaff has failed to make a substantial showing of the denial of that constitutional right.

**4.**

Mr. Schaff submits that the exposure of some jurors to extrajudicial information regarding other sexual abuse charges against him violated his right to due process. Two days after the jury rendered its verdict, juror Virginia Beatty sent the trial court a letter stating that, after trial, she was told that some jurors may have overheard a comment that other similar charges had been made against Mr. Schaff. The trial court conducted a post-trial hearing on September 14, 1990, to determine whether unauthorized prejudicial information had been communicated to the jury and, if so, whether it might have affected the verdict. Mr. Schaff moved for a new trial and subpoenaed two jurors to testify at the hearing. Juror Beatty testified that another juror told her that "she had overheard in the courtroom something that suggested that there were other charges against the defendant." Tr. at 889. Beatty reaffirmed that she had not learned the information until after trial and that she believed that the juror's overhearing of outside information "had not affected [that juror's] perception of the whole matter." *Id.* at 887. Another juror, Janet Johnson, testified that she overheard a child in the courtroom whisper to his mother " 'Is this something I'll have to go through?', something to that effect." *Id.* at 893. Johnson confirmed that she heard the statement

---

19. We note that the defendant has not established that he is entitled to an evidentiary hearing under 28 U.S.C. § 2254(e)(2)(B) concerning the possible recantation or the other ineffective assistance issues. There has been no showing that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B).

before the case had concluded.[20] The court also examined her:

Q Mrs. Johnson, at the time you heard this statement, you did not know whether it related to the Paul Schaff case or any other case?

A No, I didn't.

Q And you did not discuss that during the course of jury deliberations with any other juror?

A No.

Tr. at 898. Counsel on both sides then declined to ask further questions of this juror and declined to call any other witnesses or to present further evidence on this issue of jury tampering.

Following arguments by counsel, the court expressed its concern about juror Beatty's allegations but determined that the words of the young boy in the audience overheard by juror Johnson were "pretty innocuous" and "could relate to many different things." Tr. at 905–06. Noting that it must assess the totality of the circumstances and view the statement as a reasonable person would, the court determined that the statement did not influence Mrs. Johnson's ability to decide the case[21] and that the length of the jury's deliberations lent credence to the court's conclusion that "nothing from the outside influenced them, whether consciously or subconsciously." Tr. at 907. Finally, the court expressed its belief that Mr. Schaff was not denied due process, that no jury tampering had occurred even inadvertently, that the jury reached a verdict that they thought just, and that nothing in the record "would indicate or demand that I overturn the jury verdict." Tr. at 907. The court therefore denied Mr. Schaff's motion for a new trial.

The question whether the jury was influenced by extraneous information was reviewed on direct appeal. The state appellate court concluded that the trial court did not abuse its discretion in finding that the defendant's right to a fair trial had been safeguarded and that "the evidence convincingly establishes the jury's impartiality." *Schaff I*, 187 Ill.Dec. 975, 618 N.E.2d at 570. The state appellate court reasoned:

The testimony given at the evidentiary hearing clearly establishes that the jury was not improperly influenced by extraneous information. One juror was not even aware of the information until after the conclusion of the trial and the other simply overheard a statement from a boy to his mother in the courtroom which did not facially bear any relation to defendant. At the hearing, defendant

---

20. When the prosecutor Larry Spector asked Johnson whether the child's statement was "discussed during the proceedings of the verdict itself," Johnson answered: "Absolutely not." Tr. at 895. Shortly thereafter, the following colloquy ensued:

MR. SPECTOR: Q Did you attach any significance to that statement with regards to Paul Schaff?
THE WITNESS: Absolutely not.
Q Did you even know if that child or that statement related to Paul Schaff?
A No.
...
MR. SPECTOR: Q When you were in the courtroom after you had rendered a verdict, there was a discussion [at] which [defense counsel and state's attorneys] were present, as well as the Judge, is that correct?
THE WITNESS: Yes.

Q And at that time were you aware of the fact that there were other cases pending against the defendant Paul Schaff?
A At that time, yes.
Q And when you were made aware of that, is that what prompted the discussion later on regarding the comment that you heard in the courtroom?
A I believe so.
Tr. at 896–97.

21. The court stated that it did not believe that the child's overheard statement "in any way ... influenced Mrs. Johnson's jury-making decision, that she somehow, subconsciously held this in the back of her mind when she deliberated and I think that the record should reflect that I gather or determined that from the fact that she didn't bother—if, in fact, this had some sort of role, she, perhaps, would have discussed it with somebody else during the course of deliberations." Tr. at 906.

did not offer any additional evidence of prejudice. *Id.* The court then held that the "trial court's resolution of this issue was not improper and was in complete accord with the evidence adduced." *Id.* The appellate court reviewing Mr. Schaff's petition for post-conviction relief upheld that ruling as res judicata. *See Schaff II*, 217 Ill.Dec. 119, 666 N.E.2d at 792. The district court reviewing Mr. Schaff's petition for habeas relief held that the state appellate court's decision was not contrary to Supreme Court law and thus that he was not entitled to habeas relief.

Mr. Schaff now seeks a COA on this issue. We shall grant his request for a COA only if he makes a substantial showing of the denial of a constitutional right. Mr. Schaff claims that his Sixth Amendment right to a fair trial before an impartial jury has been violated because the jury adjudicating his innocence or guilt was exposed to improper outside contact. Such unauthorized contacts with the jury, he continues, are "presumptively prejudicial," *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954), and the trial court should determine the circumstances, impact on jurors, and prejudicial effect "in a hearing with all interested parties permitted to participate." *Id.* at 230, 74 S.Ct. 450. Mr. Schaff contends that the information received by some jurors certainly was presumptively prejudicial because it contained inflammatory and inadmissible information of other pending charges against him. The limited hearing

conducted by the trial court, in which only two jurors were questioned, failed to produce evidence sufficient to overcome this presumption. *See Remmer*, 347 U.S. at 229, 74 S.Ct. 450.

In our view, Mr. Schaff has not made the requisite substantial showing of the denial of his right to a trial by an impartial jury; therefore a COA ought not be granted. A preliminary assessment of Mr. Schaff's contentions, an assessment that must be informed by the prevailing standard for habeas relief,[22] makes clear that this case does not present a viable claim.

In *Remmer*, the Supreme Court clearly established that extraneous jury influence is "presumptively prejudicial":

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instruction and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and a hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Id.* at 229, 74 S.Ct. 450.[23] Based upon its reasoning, we must conclude that the state

---

**22.** We may grant habeas relief only if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

**23.** In *Remmer*, someone communicated with a juror during the trial; he remarked that the juror could profit by bringing in a verdict favorable to the petitioner. The juror reported the incident to the judge, who in turn

informed the prosecutors, who requested that the F.B.I. investigate. The F.B.I. spoke with the juror and concluded that the statement was made in jest; the report was given to the court and the prosecutors, and the matter was dropped. Neither the defendant nor his counsel learned of the incident until after the verdict. Holding that the "integrity of jury proceedings must not be jeopardized by unauthorized invasions," *id.* at 229, 74 S.Ct. 450, and that the trial court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permit-

appellate court's determination that Mr. Schaff was not denied a fair trial, despite the extrajudicial jury influence, was neither "contrary to" nor an "unreasonable application of" federal law as established by Supreme Court precedent. The state court, in conducting a hearing and affording the parties an opportunity to explore the issue as far as they deemed appropriate and necessary, conducted itself in a manner that must be considered a reasonable application of the Supreme Court's holding in *Remmer*. Although jury contact or tampering is deemed presumptively prejudicial under *Remmer*, the Supreme Court also has established that that presumption can be overcome if the trial court's inquiry makes clear that the deliberations of the jury were not tainted:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. . . . [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* and held in this case.

*Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

Here, a juror simply overheard a whisper from child to parent. This unintended receipt of extraneous information by the juror was an outside unauthorized communication, but it certainly was not a purposeful intrusion into the sanctity of the juror's domain. The juror herself so believed, and the state court so held. In addition, the information was not revealed to the jury during deliberation and had no effect on the juror who heard it. Notably, the court gave both parties a full opportunity to call witnesses and to present evidence; Mr. Schaff, who had moved for a new trial, completed his presentation with the testimony of those two jurors. We believe that the court's findings, made after a full hearing, satisfy Mr. Schaff's due process expectations.

 It is the prerogative of the court hearing the evidence to make a finding that the statement was innocuous, and we owe deference to that finding. It is a long-standing principle that the "substance of the *ex parte* communications and their effect on juror impartiality are questions of historical fact entitled to [the] presumption [of correctness]." *Rushen v. Spain*, 464 U.S. 114, 120, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (per curiam); *see also Porter v. Gramley*, 112 F.3d 1308, 1316 (7th Cir.1997) (stating that a state court determination that there was no jury bias during the state trial is a question of fact that the state courts are in a better position to answer), *cert. denied*, —— U.S. ——, 118 S.Ct. 886, 139 L.Ed.2d 873 (1998). Federal courts in habeas proceedings may not disturb state court findings "unless the federal habeas court articulates some basis for disarming such findings of the statutory presumption that

---

ted to participate," *id.* at 230, 74 S.Ct. 450, the Court vacated the judgment and remanded the case for a hearing.

Two years later, Justice Minton again spoke for the Court in this case. *See Remmer v. United States*, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956). The Court examined in detail the circumstances of the extraneous communication, the juror's disturbed reaction and report to the trial judge, and the subsequent investigation—including the fact that the F.B.I. agent interviewed only the juror and not the person who approached the juror.

The Court noted that the juror reported that he had felt "under a terrific pressure," *id.* at 381, 76 S.Ct. 425, and concluded that he was a troubled man and that his freedom of action as a juror had been affected:

> [The juror] had been subjected to extraneous influences to which no juror should be subjected, for it is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made.

*Id.* at 382, 76 S.Ct. 425.

they are correct and may be overcome only by convincing evidence." *Smith*, 455 U.S. at 218, 102 S.Ct. 940 (citing *Sumner v. Mata*, 449 U.S. 539, 551, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)). In this case, Mr. Schaff was in a position to call other jurors to testify at the post-trial hearing; he chose not to do so. Based on the evidence presented to it, the state court determined that the overheard statement was innocuous and that the jury's deliberations, as a whole, were not biased by the undisclosed communication. *See Rushen*, 464 U.S. at 121, 104 S.Ct. 453. We conclude that Mr. Schaff again has failed to present a substantial showing of the denial of a constitutional right, and therefore a COA will not issue on this claim.

### 5.

Mr. Schaff asserts that the trial court deprived him of due process by coercing the jury into convicting him. According to the petitioner, the court first told the jury not to expect to go home before a decision was reached; then it refused to answer the jury's questions regarding the meaning of "reasonable doubt" and whether there were alternatives to a unanimous verdict. The court refused to provide the jury with transcripts they requested, Mr. Schaff claims. It also asked twice what the jury's "count" or numerical division of the vote was. Finally, he contends, the court gave the jury an improper deadlock instruction which omitted critical language admonishing the jurors that they should not surrender their "honest conviction as to the weight or effect of evidence solely" to return a verdict.

The state appellate court reviewed the question whether the jury's deliberations were influenced by judicial coercion and rejected the claim. *See Schaff I*, 187 Ill.Dec. 975, 618 N.E.2d at 569–70. The appellate court later held that the prior ruling on direct appeal was res judicata. *See Schaff II*, 217 Ill.Dec. 119, 666 N.E.2d at 792. The district court, on habeas review, concluded that the Illinois appellate court's thorough analysis was a reasonable application of clearly established Supreme Court precedent as found in *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), and denied habeas relief.

Mr. Schaff's claims that the trial court coercively told the jury it would not go home until a decision was reached and then refused to answer questions or to provide transcripts are new claims, not raised in state court. He submits that the cumulative effect of the sequence of interactions between judge and jury must be examined under all the circumstances to see if there was coercion. Mr. Schaff contends that, under *Lowenfield*, the totality of the circumstances—jury polling coupled with an incomplete deadlock instruction—can establish that the jury was coerced. He concludes that this coercion requires habeas relief. Because Mr. Schaff presented to the state courts only the issues of a faulty instruction and the court's inquiries on polling figures, however, we shall consider only those aspects of this claim.

In an attempt to demonstrate that his claim is supported by clearly established case law from the Supreme Court, Mr. Schaff relies on *Lowenfield*, which held that, on the facts presented there, the trial judge's supplemental jury instruction and polling of the jury did not coerce unconstitutionally the jurors "in such a way as to deny the petitioner any constitutional right." *Id.* at 241, 108 S.Ct. 546. To secure the COA, Mr. Schaff must make a substantial showing that his right to an impartial, uncoerced jury was denied. Mr. Schaff has failed to make such a demonstration. Mr. Schaff cannot point to any Supreme Court case holding that (1) a jury instruction of the sort used in this case violates the federal constitution or federal law, or that (2) a state court judge's inquiry into the numerical breakdown of the

jury's votes is constitutionally prohibited. We therefore cannot say that the Illinois court's decision was contrary to or an unreasonable application of *Lowenfield*.

### Conclusion

Because Mr. Schaff has failed to meet the statutory criteria for the issuance of a writ of habeas corpus, we must affirm the judgment of the district court.

A<small>FFIRMED</small>