Edward A. **MURILLO**, Petitioner,

v.

Matthew **FRANK**[1], Respondent.

No. 01–C–1285.

United States District Court,
E.D. Wisconsin.

April 6, 2004.

---

1. Pursuant to Fed.R.Civ.P. § 25(d)(1) Matthew Frank is substituted for the previous defendant Jon Litscher.

Craig W. Albee, Glynn Fitzgerald & Albee, Milwaukee, WI, for Petitioner.

William L. Gansner, Wisconsin Department of Justice, Madison, WI, for Respondent.

## DECISION AND ORDER

GRIESBACH, District Judge.

On January 29, 1999, Petitioner Edward A. Murillo was convicted in the Circuit Court for Racine County of first degree intentional homicide and related crimes arising out of the shooting death of Santiago Herrera. He is presently serving a life sentence in the custody of the Wisconsin Department of Corrections. Petitioner claims that his conviction was unconstitutionally obtained when the state was allowed to introduce in evidence against him his brother's uncross-examined statement implicating him in the crime. Having exhausted his state court remedies, petitioner now seeks federal habeas corpus under 28 U.S.C. § 2254. For the reasons that follow, I conclude that his petition must be granted.

## I. FACTS

On June 23, 1998, Santiago Herrera was shot and killed while standing on the porch of his home. Moments earlier, Herrera had been seen on the porch with Zebulon Robinson, a minor at the time, who was attempting to purchase marijuana from Herrera. Robinson later told police that while he was standing on the porch with Herrera, he saw three individuals approach. Robinson identified the three as petitioner Edward Murillo, petitioner's brother Luis, and Mario Garcia, all members of the La Familia gang. Robinson told police that Edward Murillo pointed a gun at him and ordered him to get off the porch. Edward then made a statement to Herrera to the effect that "you Kings don't run nothing over here no more so get off our block." Robinson claimed Edward then shot Herrera, handed the gun to Robinson, and told him to get rid of it. Robinson hid the gun at a friend's house. (R. 61, Doc. 28 at 4–22.)

Six days later, police arrested Luis Murillo and, after reading him his *Miranda* rights, questioned him for more than three hours. Luis, who was himself a suspect, initially told police he was not in the area of the shooting, but was with his girlfriend watching television. Investigator William Warmington, who was conducting the interrogation, left the interview room, but

returned a short time later and told Luis they had checked out his story and it did not hold up. Luis was then informed that he had been identified as a suspect through a Crime Stoppers tip. Luis became more nervous and told the police that he was near the shooting and saw those involved running away, but that he did not do anything. After a break, Luis became increasingly upset and, according to Warmington, was crying, pacing, praying and collapsing. He ultimately told the officer that he saw his brother Edward shoot Herrera and signed an affidavit to that effect. (R. 59, Doc. 26 at 36–0; R. 71, Doc. 32 at 41–42, 54–59.)

Petitioner was thereafter arrested and charged with first degree intentional homicide, intentionally giving a dangerous weapon to a child and possession of a firearm by a felon. Prior to trial, the state attempted to take Luis's deposition. Luis refused to testify, however, asserting his Fifth Amendment right against self-incrimination. Luis was granted immunity but still refused to testify and was held in contempt. (R. 58, Doc. 25.) Petitioner then filed a motion *in limine* to exclude Luis's statement in the event he persisted in his refusal to testify at trial on the grounds that it was hearsay and admitting the statement would violate his constitutional right to confront a witness against him. (R. 19, Doc. 3.) The trial court denied the motion, holding that the statement fell under both the penal interest and social interest exceptions to Wisconsin's hearsay rule. *See* Wis. Stat. § 908.045(4).[2] The trial court also held that admission of the statement would not violate the Con-

frontation Clause of the Sixth Amendment because both of the exceptions to the hearsay rule under which it found the statement admissible were "firmly rooted" within the meaning of *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). (R. 59, Doc. 26 at 53–56.)

At trial, as anticipated, Luis refused to testify and did not appear before the jury. The trial court, over the objection of petitioner's attorney, allowed Investigator Warmington to relate Luis's statement to the jury. The trial court also admitted the affidavit that Luis had signed at the conclusion of the interview. On the basis of this and other evidence introduced over the course of the trial, the jury returned verdicts of guilty on each of the charges.

Following the denial of his motion for post conviction relief, petitioner appealed. The Wisconsin Court of Appeals affirmed his conviction, holding that Luis's statement satisfied the social interest exception to Wisconsin's hearsay rule and its admission did not violate the Sixth Amendment's Confrontation Clause. *State v. Murillo,* 2001 WI App 11, 240 Wis.2d 666, 623 N.W.2d 187 (2000). Because the court concluded that Luis's statement qualified under the social interest exception, it found it unnecessary to address the question of whether Luis's statement was against his penal interest. And although the court of appeals rejected the trial court's holding that the social interest exception is a firmly rooted hearsay exception, it nevertheless found that the admission of the statement did not violate the Confrontation Clause because it bore "particularized guarantees of trustworthiness"

**2.** Section 908.045 provides that statements against interest are not excluded by the hearsay rule if the declarant is unavailable. Subsection (4) defines a statement against interest as:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far

tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in the declarant's position would not have made the statement unless the person believed the statement to be true.

sufficient to justify its use at trial. After the Wisconsin Supreme Court denied further review, Edward filed his petition for federal habeas corpus.

## ANALYSIS

### A. The AEDPA Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas corpus relief for persons serving sentences imposed by state courts may not be granted on any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

■■■ Petitioner does not contend that the state court decision in his case was based on an unreasonable determination of the facts. Thus, § 2254(d)(2) is not at issue. Instead, his claim is that the decision of the Wisconsin Court of Appeals is contrary to, or involved an unreasonable application of, clearly established federal law under § 2254(d)(1). Under this standard, lower federal courts must look exclusively to Supreme Court precedent in reviewing petitioners' claims. *Sweeney v. Parke*, 113 F.3d 716, 718 (7th Cir.1997). Petitioners "must show that the Supreme Court has 'clearly established' the propositions essential to their position." *Mueller v. Sullivan*, 141 F.3d 1232, 1234 (7th Cir. 1998).

■■■ A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme

Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The state court decision involves an unreasonable application of such law if "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case," or "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407, 120 S.Ct. 1495.

### B. Confrontation Clause Claim

■■■ Federal law, as determined by the Supreme Court, has long recognized the right of a person accused of a crime to confront the witnesses against him and to subject such witnesses to cross-examination, "the greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). This fundamental right, specifically enumerated in the Sixth Amendment, applies to both federal and state prosecutions. *Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). But the Court has never held that the Confrontation Clause bars the use of all hearsay evidence at a criminal trial. Such an approach, the Court has noted, has been "long rejected as unintended and too extreme." *Ohio v. Roberts*, 448 U.S. at 63, 100 S.Ct. 2531. The issue over which the courts have struggled is in determining what statements can be admitted without running afoul of the Sixth Amendment.

There is no doubt that the decision of the Wisconsin Court of Appeals in petition-

er's case is contrary to clearly established federal law as it presently exists. This is because the United States Supreme Court has recently held unequivocally that the Sixth Amendment Confrontation Clause bars the use against a defendant of statements made by a non-testifying witness in the course of an interview with the police. In *Crawford v. Washington,* —— U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Court reversed a defendant's conviction for assault and attempted murder on the ground that the introduction at his trial of a recorded statement by his wife made during a police interrogation violated his Sixth Amendment right to confront the witnesses against him. The Court held that the testimonial statement [3] of a witness who is unavailable can only be admitted at trial if the defendant has had a prior opportunity to cross-examine that witness. *Id.* at 1374. In so ruling, the Court explicitly rejected its language in *Ohio v. Roberts* that appeared to permit the use of such statements when the witness was unavailable as long as the statement bore "adequate indicia of reliability." 448 U.S. at 66, 100 S.Ct. 2531. Thus, if the Wisconsin Court of Appeals were to rule the same way today, its decision would unquestionably be "contrary to clearly established federal law, as determined by the United States Supreme Court" and petitioner would be entitled to relief under § 2254(d)(1).

■ But because *Crawford* was decided after petitioner's conviction became final, it cannot be used to determine whether the state court decision is contrary to established federal law. It is to federal law as it existed at the time of the state court decision that a federal habeas court must look in deciding whether the petition should be granted. *Schaff v. Snyder,* 190 F.3d 513, 522 (7th Cir.1999) ("A petitioner must have a Supreme Court case to support his claim, and that Supreme Court decision must have clearly established the relevant principle as of the time of his direct appeal."). The only exception to this principle is that Supreme Court cases that apply what would be considered an "old rule" within the meaning of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), constitute "clearly established federal law as determined by the Supreme Court" under § 2254(d)(1), and therefore apply retroactively in habeas cases. *Williams v. Taylor,* 529 U.S. at 412, 120 S.Ct. 1495. Thus, *Crawford* would apply only if the rule it announced could be considered "old."

■ The determination of whether a rule is "old" or "new" for retroactivity purposes is not without its difficulties. *Taylor,* 529 U.S. at 381, 120 S.Ct. 1495. According to *Teague,* "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." 489 U.S. at 301, 109 S.Ct. 1060. A case announces an old rule, on the other hand, if the result was dictated by precedent that existed at the time the petitioner's conviction became final. *Id.* Although a close question, I conclude that because *Crawford* essentially overruled *Roberts,* at least as it applies to testimonial statements, it's holding must be considered a new rule.[4] I therefore

---

3. Although the Court declined in *Crawford* to provide a complete definition of what it meant by "testimonial" statements, there is no doubt it is intended to include the kind of statement at issue here. "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police

interrogations." —— U.S. at ——, 124 S.Ct. at 1374.

4. The question is close because although *Crawford* rejected the application of *Roberts* to testimonial statements, the Court had never explicitly applied *Roberts* to such statements. As Justice Scalia noted in his opinion for the

conclude it does not apply and turn to the state of the law as it existed prior to *Crawford.*

Until the Court's recent decision in *Crawford, Ohio v. Roberts* provided the framework for determining the admissibility of out-of-court statements under the Confrontation Clause. In *Roberts*, the Court upheld the use at trial of the preliminary hearing testimony of a witness who the state was unable to locate. Despite the fact that the defendant was unable to confront and cross-examine the witness at trial, the Court found no confrontation violation. The unavailability of the witness, combined with the fact that the earlier testimony had been given under oath in a proceeding at which the defendant had an opportunity to cross-examine her, was found sufficient to satisfy the requirements of the Confrontation Clause. The Court held that the circumstances under which the prior testimony was given provided "sufficient indicia of its reliability." 448 U.S. at 73, 100 S.Ct. 2531. In summarizing the approach to be taken in determining whether hearsay statements offered against an accused satisfy the Confrontation Clause, the Court stated that first, in the usual case, the state must show that the declarant is unavailable. Second, once unavailability of the witness is established,

> his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of par-

ticularized guarantees of trustworthiness.

448 U.S. at 66, 100 S.Ct. 2531.

In cases decided since *Roberts*, the Court has moved away from the requirement that the declarant be shown to be unavailable when the statement being offered is one whose reliability is based on the circumstances under which it is made. In *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), for example, the Court held that co-conspirator statements made in the course and in furtherance of the conspiracy were admissible without a showing that the declarant was unavailable. And in *White v. Illinois*, 502 U.S. 346, 355, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), the Court held that spontaneous declarations, or so-called excited utterances, as well as statements made in the course of receiving medical care, are made under circumstances and in contexts that provide substantial guarantees of their trustworthiness, notwithstanding the fact that they are not subjected to cross-examination, and thus do not require a showing that the declarant is unavailable.

But while the unavailability rule of *Roberts* was relaxed, the requirement that the offered statement bear "particularized guarantees of trustworthiness," 448 U.S. at 66, 100 S.Ct. 2531, remained in full force. It is on this part of the *Roberts* test that the Wisconsin Court of Appeals relied in upholding the use of Luis's statement in this case and affirming petitioner's conviction. Accepting the state's concession that the social interest exception to Wisconsin's hearsay rule was not "firmly rooted" such that the reliability of the statement could

*Crawford* majority, "[o]ur cases have thus remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where

the defendant has had a prior opportunity to cross-examine." 124 S.Ct. at 1369. Thus, it can be argued that *Crawford* did not announce a new rule at all.

be inferred, the court nevertheless concluded that the statement contained the required "particularized guarantees of trustworthiness" to be admissible.

In so ruling, the court relied primarily upon Luis's emotional condition at the time as reflected in his statements, actions, and demeanor which were described in detail by Investigator Warmington:

He was very emotional, very upset and very afraid. He was alternately crying with tears just literally streaming down his face, pacing, his voice was cracking. He asked me several times what do I do. He collapsed on the floor a number of times where he just dropped.. He just dropped and was in a position—in a seated position on the floor. There were a couple of times he was in a praying position on his knees with his elbows on the chairs, clasped his hands and appeared to be praying and the entire time he was continually sobbing and crying.

623 N.W.2d at 189. Investigator Warmington also testified that Luis expressed fear of testifying against his brother. *Id.*

Although the court of appeals recognized that "suspects have a natural motive to shift the blame to each other rather than tell the truth," it concluded that was not the case here. The evidence presented, the court stated, "convinces us, as it convinced the trial court, that Luis's statement was not borne out of any motive to shift the blame." *Id.* at 193. The court therefore concluded that petitioner's right to confrontation was not violated.

Petitioner contends that the decision of the Wisconsin Court of Appeals affirming his conviction is contrary to, or involves an unreasonable application of clearly established federal law as enunciated by the Supreme Court in *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), a case decided four months after his trial. In *Lilly*, the defendant Benja-

min Lilly, his brother Mark, and Mark's roommate were arrested following a crime spree which included a series of break-ins and robberies and culminated in the abduction and murder of Alex DeFilippis. In two tape-recorded statements, Mark emphasized to police that he was extremely drunk during the crime spree, but admitted that he had stolen liquor and beer in the initial burglary and the robbery of the store, and that he had handled one of the guns taken in the burglary. When police suggested his brother may be dragging him into a life sentence, Mark claimed that his brother had instigated the car-jacking and ultimately stated it was his brother who had killed DeFilippis. Later when called as a witness at Benjamin's trial, however, Mark refused to testify. The trial court admitted Mark's statement to police over Benjamin's objection as a statement against penal interest, and Benjamin was convicted. On appeal, the Supreme Court of Virginia affirmed, holding that the introduction of the statement did not violate the Confrontation Clause because statements against penal interest were a firmly rooted exception to the hearsay rule in Virginia. A unanimous Supreme Court reversed.

A plurality of the Court (Justice Stevens, joined by Justices Souter, Ginsburg and Breyer) held that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." 527 U.S. at 134, 119 S.Ct. 1887. The plurality noted that the Court had "over the years 'spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants.'" *Id.* at 131, 119 S.Ct. 1887 (quoting *Lee v. Illinois*, 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986)). Thus, Mark's statements did not fall within a firmly rooted hearsay exception. The

plurality then turned to the question of whether the statements bore "particularized guarantees of trustworthiness."

The trial court in *Lilly* had held that Mark's statements "were reliable in the context of the facts and circumstances under which they were given because (i) Mark Lilly was cognizant of the import of his statements and that he was implicating himself as a participant in numerous crimes and (ii) elements of his statement were independently corroborated by other evidence offered at trial." 527 U.S. at 135, 119 S.Ct. 1887 (internal quotes and brackets omitted). The Commonwealth argued that these two indicia of reliability, "coupled with the facts that the police read Mark his *Miranda* rights and did not promise him leniency in exchange for his statements, demonstrate that the circumstances surrounding his statements bore 'particularized guarantees of trustworthiness' sufficient to satisfy the Confrontation Clause's residual admissibility test." *Id.*

The *Lilly* plurality rejected this argument. It noted that "[t]he residual 'trustworthiness' test credits the axiom that a rigid application of the Clause's standard for admissibility might in an exceptional case exclude a statement of an unavailable witness that is incontestably probative, competent, and reliable, yet nonetheless outside of any firmly rooted hearsay exception." *Id.* at 136, 119 S.Ct. 1887. It thus allows admission of statements "[w]hen a court can be confident—as in the context of hearsay falling within a firmly rooted hearsay exception—that 'the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility.'" *Id.* (quoting *Idaho v. Wright,* 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)). The plurality also noted that the Court had long held that accomplice confessions are presumptively unreliable. *Id.* at 137, 119 S.Ct. 1887. *See*

*also Lee v. Illinois,* 476 U.S. 530, 545, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) ("As we have consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another.") And while it was true the Court had previously indicated this presumption of unreliability could conceivably be rebutted, the plurality stated that the Court's prior confrontation cases suggested this was highly unlikely in cases where one suspect accuses another in the course of police interrogation:

> It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice—that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.

527 U.S. at 137, 119 S.Ct. 1887.

Applying these principles to the facts before it, the *Lilly* plurality concluded that Mark's statements implicating his brother were not sufficiently reliable to satisfy the Confrontation Clause:

> It is abundantly clear that neither the words that Mark spoke nor the setting in which he was questioned provides any basis for concluding that his comments regarding petitioner's guilt were so reliable that there was no need to subject them to adversarial testing in a trial setting. Mark was in custody for his involvement in, and knowledge of, serious crimes and made his statements under the supervision of governmental au-

thorities. He was primarily responding to the officers' leading questions, which were asked without any contemporaneous cross-examination by adverse parties. Thus, Mark had a natural motive to attempt to exculpate himself as much as possible. Mark also was *obviously* still under the influence of alcohol. Each of these factors militates against finding that his statements were so inherently reliable that cross-examination would have been superfluous.

527 U.S. at 139, 119 S.Ct. 1887.

■ Of course, a plurality opinion, by itself, does not clearly establish the law. But when considered with Justice Scalia's succinct concurrence, Justice Stevens' plurality opinion must be viewed as the holding of the Court. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members *who concurred in the judgments* on the narrowest grounds ....' " *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). In his concurring opinion, Justice Scalia characterized the use of Mark Lilly's tape-recorded statements at his brother's trial without making Mark available for cross-examination as "a paradigmatic Confrontation Clause violation." *Id.* at 143, 96 S.Ct. 2909. In his view, the only further inquiry required was whether the violation constituted harmless error. It is thus clear that the rationale of the plurality represents the narrowest ground of agreement and may be taken as establishing federal law.

Petitioner argues that the Wisconsin Court of Appeals' decision in his case is contrary to *Lilly* "because it fails to heed *Lilly 's* teaching that custodial statements which shift blame to another without the opportunity for cross-examination are, as a matter of law, unreliable." (Mem. In Supp. of Pet. at 12.) He contends that "*Lilly* established a virtually irrebuttable presumption that custodial statements which shift blame to the defendant are unreliable." (*Id.* at 11.) Petitioner's reading of *Lilly*, however, is overbroad. *Lilly* did not establish an irrebuttable presumption that custodial statements of an accomplice that incriminate a defendant are unreliable as a matter of law. Although the *Lilly* plurality noted that it was highly unlikely the presumption of unreliability that attends such statements could be rebutted, it explicitly recognized that Virginia's contention that the presumption may be rebutted was correct. 527 U.S. at 137, 119 S.Ct. 1887. The plurality then proceeded to analyze the specific facts of the case before it and concluded that they were not sufficient to rebut the presumption of unreliability. The possibility that the presumption could be rebutted, however, was implicit in the plurality's analysis. I therefore do not find that the Wisconsin court applied "a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams v. Taylor*, 529 U.S. at 405, 120 S.Ct. 1495.

■ But a state court decision can still be contrary to clearly established federal law even if the state court does not apply a rule that contradicts Supreme Court precedent. A state court decision will also be found to be contrary to clearly established federal law if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a different result from [Supreme Court] precedent." *Id.* It is in this respect that I conclude the court of appeals' decision is contrary to federal law. As to the material facts, this case is indistinguishable from *Lilly*. In both cases, the prosecution was

allowed to introduce in evidence against the defendant a statement obtained from another suspect as he was being questioned by police about the same crime for which the defendant was on trial. In both cases, it was the defendant's own brother. Here, Luis had been told he was a suspect in the shooting and, just as the defendant's brother in *Lilly*, had reason to believe that shifting responsibility for the crime to another would be in his interest.

Despite these similarities, the Wisconsin Court of Appeals saw "a world of difference between the facts surrounding Luis's statements and the facts surrounding Mark Lilly's statement." 240 Wis.2d at 680, 623 N.W.2d 187. It noted that there was a great deal of evidence that demonstrated Luis's actual state of mind and emotional distress, whereas *Lilly* was silent on that issue. The state court also noted that Luis's statement had been admitted as a statement against social interest, while Mark Lilly's was admitted as a statement against penal interest. For this reason, the fact that Mark Lilly was the defendant's brother had not played a role in the *Lilly* plurality's analysis. The state court also stated that "Mark's statements came in response to an interrogating officer's leading questions, unlike Luis's statements," and that "because Mark was up to his neck in criminal involvement, he had what the Court described as a 'natural motive' to exculpate himself as much as possible, unlike Luis." *Id.* Finally, the state court noted that Mark was under the influence of alcohol, also unlike Luis. Based upon these differences, the court concluded that this case was not governed by *Lilly.*

But it is not enough that there are differences between the two cases. No two cases are ever exactly alike in all respects. To warrant different conclusions, the differences must be material; they must be legally significant. Here, I conclude that they were not.

The trial court and the court of appeals placed great weight on the fact that Luis was emotionally distraught at the time he gave the statement implicating his brother in the shooting. Under the circumstances, such emotional distress was understandable. Luis was, after all, being questioned as a suspect in a murder. What is not clear, however, is how the fact that Luis was distraught makes his claim that his brother was the shooter more reliable. One might be just as likely to experience emotional distress, fear, and anxiety if he were to falsely accuse his own brother so as to avoid prosecution himself as he would if he were telling the truth. The fact that he was distressed doesn't indicate Luis was being truthful. As the Court noted in *Wright:*

> A statement made under duress ... may happen to be a true statement, but the circumstances under which it is made may provide no basis for supposing that the declarant is particularly likely to be telling the truth—indeed the circumstances may even be such that the declarant is particularly *un* likely to be telling the truth. In such a case, cross-examination at trial would be highly useful to probe the declarant's state of mind when he made the statements; the presence of evidence tending to corroborate the truth of the statement would be no substitute for cross-examination of the defendant at trial.

*Idaho v. Wright,* 497 U.S. at 822–23, 110 S.Ct. 3139 (emphasis original).

Nor is it significant that the Wisconsin court analyzed Luis's statement under the "against social interest" exception to the hearsay rule, whereas the *Lilly* plurality considered Mark Lilly's statement as a statement against penal interest. If anything, this difference makes petitioner's

case stronger than *Lilly* since the exception for statements against penal interest is more widely recognized than the "against social interest" exception. This is no doubt based on the common sense judgment that a person is more likely to lie to avoid prison, perhaps for life, than he would to avoid embarrassment or disappointing his family. It is for this reason that the social interest exception was deleted from the proposed draft of the Federal Rules of Evidence and is recognized by only a minority of the States. *See* 2 John W. Strong, *McCormick On Evidence* § 318 at 323 (5th ed.1999).

In truth, it is questionable whether Luis's statement was even against his social interest as that exception has been traditionally understood. By its terms, the exception applies to statements that would "make the declarant an object of hatred, ridicule or disgrace" such that "a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." Wis. Stat. § 908.045(4). Here, the court of appeals concluded that Luis's statement fell within this exception because his brother would have resented him for turning on him, his family would hold him responsible for his brother's arrest and his fellow gang members would likely be angered. 240 Wis.2d at 676, 623 N.W.2d 187. But in *State v. Stevens*, 171 Wis.2d 106, 490 N.W.2d 753 (1992), the Wisconsin courts' most extensive discussion of the exception, the court cautioned against treating accusatory statements as against social interest since statements that accuse another person of a crime will always engender anger and resentment on the part of the person accused, his family and friends. "The exception swallows the rule," the court noted, "if hearsay testimony can be admitted whenever the declarant faces social disapproval simply for making an accusation." 171 Wis.2d at 117, 490 N.W.2d 753.

The *Stevens* court went on to note that in determining whether a statement is against one's social interest, the crucial issue is the extent of the declarant's personal connection to, or involvement with, the activity reported in his or her declaration. According to the court,

> Just as is the case for statements against penal or proprietary interest, the social interest exception demands that the declarant have a personal interest in keeping the statement secret. It is that personal interest that guarantees reliability. Without this requirement for personal connection to the event or activity reported in the hearsay statement, the social interest exception would permit the admission of any statement where it can be shown that the declarant will be intensely disliked by someone for making the statement.

171 Wis.2d at 118, 490 N.W.2d 753. In this case, Luis's statement purported to relate his brother's conduct, not his own. He acknowledged no conduct on his part that would have made him the object of hatred, ridicule or disgrace. While it is true that accusing his brother may have made people close to his brother angry at him, there was nothing inherent in the statement itself that was against Luis's interest. On the contrary, in light of the fact that police told him he had been named as a suspect in the murder, it was clearly in Luis's interest to shift the blame elsewhere, even if in this case, as in *Lilly*, elsewhere meant his own brother.

The state court also sought to distinguish this case from *Lilly* by noting that Mark Lilly was "up to his neck in criminal involvement," whereas Luis was not. But the record fails to demonstrate that Luis's position was appreciably different from Mark Lilly's at the time he implicated his brother. Luis had been arrested as a suspect in a murder investigation. He was

read his *Miranda* rights and questioned for three hours, during which time he gave several different versions of the events in question. While it is true that Luis was not suspected of other crimes in addition to the murder of Herrera, this fact would not have lessened his desire to avoid a murder charge. Under these circumstances, Luis, like Mark Lilly, had motive to shift the blame for the murder to another.[5]

And while it does not appear from Investigator Warmington's testimony that the questions he asked of Luis were leading (in fact, at one point, Luis specifically asked Warmington what he should do)(R. 71, Doc. 32 at 50–55), there was no tape recording made of the interview. In this respect, this case presents a difficulty that *Lilly* did not. Mark Lilly's statement was tape recorded and thus offered the listener an opportunity to evaluate the actual statements that were made based on the sound of Mark's voice and the substance and tone of the questions he was asked. Luis's interrogation, by contrast, was not recorded. Instead, after the interview was completed, Officer Warmington typed an affidavit for Luis's signature, and it was this affidavit that was introduced in evidence against petitioner at trial. In this respect, the procedure used in this case more closely resembles the very procedure that a clear majority of the Supreme Court has now concluded the Sixth Amendment was most intended to outlaw. *See Crawford v. Washington,* —— U.S. at ——, 124 S.Ct. at 1363 ("[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused."). *See also White v. Illinois,* 502 U.S. at 363, 112 S.Ct. 736 (Thomas, J., concurring) ("Nor does it seem likely that the drafters of the Sixth Amendment intended to permit a defendant to be tried on the basis of *ex parte* affidavits found to be reliable.").

In sum, while it is true the facts of the two cases are not identical, I am unable to conclude that the differences are legally significant in light of the Supreme Court's previous rulings in this area. I can find no material difference between the facts of this case and those of *Lilly* that would justify the conclusion here that admission of Luis's statement without affording petitioner an opportunity to confront and cross-examine him did not violate petitioner's rights under the Confrontation Clause. I therefore conclude that the decision of the state court of appeals is contrary to clearly established federal law and that the trial court erred in admitting Luis's statement at petitioner's trial.

## C. Harmless Error

As a general rule, an error that does not cause the petitioner's custody is not a basis for relief under § 2254(d). In other words, habeas relief should not be granted even if there was constitutional error, unless the error resulted in harm to the petitioner. The standard for whether constitutional error is harmless under § 2254(d) is whether it had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct.

---

**5.** Of course, it is true that if Luis was simply attempting to shift the blame from himself, he could have claimed Robinson was the shooter, as his brother did at trial, or that it was Garcia. But in *Lilly,* where a similar option was available to the defendant's brother, the plurality noted that under *Wright,* other evidence in the case cannot be used to establish a statement's reliability: " 'To be admissible under the Confrontation Clause,' we held, 'hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.' " *Lilly,* 527 U.S. at 138, 119 S.Ct. 1887 (quoting *Wright,* 497 U.S. at 822, 110 S.Ct. 3139).

1710, 123 L.Ed.2d 353 (1993); *Aleman v. Sternes,* 320 F.3d 687, 690 (7th Cir.2003). On this question, the burden is on the respondent. "[W]hen a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *O'Neal v. McAninch,* 513 U.S. 432, 445, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). In this case, I am not convinced that the error was harmless.

The state's primary witness against petitioner at his trial was Zebulon Robinson, who testified that he had seen petitioner approach Herrera as he was standing on his porch and shoot him. However, there was no physical evidence that could tie petitioner to the crime and corroborate Robinson's testimony. Petitioner's fingerprints were not found on the gun and none of Herrera's blood was found on his clothing.

Petitioner's theory of defense, on the other hand, was that Robinson himself was the shooter. In support of this theory, petitioner pointed to evidence that Robinson had been seen arguing with Herrera about drugs shortly before the shooting and had fled from the scene immediately afterwards, taking with him the murder weapon which he gave to a friend to hide. In addition, petitioner was able to challenge Robinson's credibility by introducing evidence of his drug use, his previous delinquency adjudications, and the inconsistencies between his trial testimony, his statements to the police, and his preliminary hearing testimony.

Under these circumstances, the statement of petitioner's own brother naming him as the shooter was an important piece of evidence. It not only provided corroboration for Robinson's version of the events, but because Luis was petitioner's brother, the statement carried added weight, a fact apparently appreciated by the jury. Of the two questions they asked in the course of their deliberations, both related to

Luis's statement. They asked for a copy of his sworn statement and why he was not called to the stand to testify. (R. 31, Doc. 10.)

The Supreme Court of Virginia was confronted with essentially the same question on remand in *Lilly. Lilly v. Commonwealth,* 258 Va. 548, 523 S.E.2d 208 (1999). Of the three individuals that were present at the murder in that case, only one testified at the defendant's trial. The statement of the defendant's brother was used, as was Luis's statement here, to corroborate that witness's testimony. Under these circumstances, the court concluded, "we must presume that such evidence had the potential to influence the jury into accepting the properly admitted evidence as more credible and, thus, to taint the jury's determination of the facts." 523 S.E.2d at 210.

I reach the same conclusion here. The admission of Luis's uncross-examined statement at petitioner's trial had a substantial and injurious effect or influence in determining the jury's verdict. The error in admitting the statement was not harmless and the writ sought by petitioner must therefore be granted.

**IT IS THEREFORE ORDERED** that the petition for a writ of habeas corpus should be and hereby is granted. The order will be stayed for a period of 30 days, however, to allow the respondent an opportunity to determine whether he will appeal this decision. In the event an appeal is filed, the court will consider a motion to extend the stay. If instead the state elects to retry petitioner, he shall be returned to the Circuit Court for Racine County for consideration of bail.